UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ERIC PACE,

    Plaintiff,

vs.                                         Case No. 8:05-CV-1221-T-27EAJ

CITY OF PALMETTO, a municipal
Corporation, and OFFICER KRISTOPHER
S. AHLER, individually and in his official
capacity,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** are Defendant Kristopher Ahler's Supplemental Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 65) and Plaintiff's Supplemental Memorandum of Law in Opposition to Ahler's Motion for Summary Judgment (Dkt. 76).[1] Upon consideration, Defendant's motion for summary judgment is **GRANTED**.

Eric Pace initiated this lawsuit against Kristopher Ahler alleging in Count II of the Complaint that Ahler used unreasonable force in violation of 42 U.S.C. § 1983 when Ahler, a city police officer, and his K-9 unit, Brix, apprehended and arrested Pace. (Dkt. 2). In Count IV of the Complaint, Pace alleges that in the course of his arrest, Ahler committed an assault and battery on him. (Dkt. 2). Ahler contends summary judgment is appropriate on both counts because he is entitled to qualified immunity as to Count II and statutory immunity as to Count IV.

---

[1] On September 1, 2006, this Court denied Ahler's motion to dismiss and deferred ruling on Ahler's alternative motion for summary judgment on the basis of qualified immunity (Dkt. 18). (Dkt. 44). The parties were given until March 31, 2007 to supplement the record. (Dkt. 46). The parties were permitted to file supplemental briefs not exceeding twenty pages in length on or before April 12, 2007. (Dkt. 64).

1

## Applicable Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (*internal citations omitted*). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

## Factual Background

On January 20 and 21, 2003, Palmetto police officers were investigating a burglary of an occupied dwelling from which $844 and a Dodge Caravan were reported stolen. (Ahler Aff., ¶3). On January 23, 2003, at approximately 3:30 A.M., Officer Ryan Larowe observed the stolen Caravan and requested backup from Officer Kris Ahler and Officer Michael Kelly. (Ahler Aff., ¶ 4; Larowe Depo., pp. 36-37). Larowe confirmed that the Caravan's license tag matched the vehicle reported

to have been stolen. (Larowe Depo., p. 36).

Pace was driving the stolen Caravan that night. (Pace Depo., p. 8). He saw two marked police cars flashing their lights behind him. He understood that the officers were trying to pull him over. (Pace Depo., pp. 8-9). When he saw the police cars behind him he "got scared and started driving away." *Id.* The police cars chased Pace for approximately "two minutes" on city streets. *Id.* During the chase, Pace was traveling in excess of the speed limit, at times seventy or eighty miles per hour, running through stop signs. (Pace Depo., pp. 8-9; Ahler Aff., ¶ 5). Pace turned off his headlights and pulled into a field "to hide from [the police]." (Pace Depo., pp. 10, 70; Ahler Aff., ¶ 5). He exited the stolen vehicle and fled on foot into a mangrove swamp. *Id.* According to Pace, it was raining that night and the mangrove swamp was pitch dark with ditches and "mangrove trees everywhere." (Pace Depo., pp. 13, 17, 18). At times, he was standing in water up to his knee or thigh. *Id.*

Ahler, who had been following Pace, pulled into the field, stopping behind the abandoned Caravan. Ahler was accompanied by his K-9, Brix. (Ahler Aff., ¶ 6). Ahler observed a pistol on the seat of the Caravan. (Ahler Aff., ¶ 6, Ahler Depo. II, p. 85).[2] With Brix on a leash, Ahler began tracking Pace in the mangrove swamp. (Ahler Aff., ¶ 7; Ahler Depo. II, p. 83). He described the swamp as having "dense mature mangroves whose branches and roots were interlaced together." (Ahler Aff., ¶ 7). At times, Ahler was in chest deep water. *Id.* Ahler testified that it was "extremely

---

[2] Pace testified that he did not know whether there was a weapon in the Caravan. (Pace Depo., p. 11). The pistol was identified in the Palmetto Police inventory of the Dodge Caravan after it was towed to the police station. (LaGasse Depo, pp. 10, 18; LeGasse Depo., Ex. 1). It was determined that the pistol was a pellet pistol. (Ahler Aff., ¶ 6, Legasse Depo., p. 54). Pace testified that the stolen vehicle was in his possession for "a day or two" prior to his arrest, but that he had let a friend use the vehicle during that time period. (Pace Depo., pp. 10-11). However, for several hours before his arrest, Pace was the only one using the vehicle. (Pace Depo., p. 13).

difficult to pursue Pace under [the] conditions." *Id.* According to Ahler, he called out to Pace a number of times to stop fleeing and warned him that he was going to release Brix off of the leash if Pace did not surrender. (Ahler Aff., ¶¶ 7, 8). Officer Larowe, who assisted in apprehending Pace, heard Alher shout "Police, stop, There's a K-9. Stop or you're going to get bit." (Larowe Depo., p. 55).

While running through the swamp, Pace did not look behind him to see if anyone was pursuing him but believed the police would track him. (Pace Depo., pp. 80-81). He did not hear any officers chasing or calling warnings out to him, but heard a dog running close behind him. (Pace Depo., pp. 14-16). Notwithstanding, Pace kept running to avoid being apprehended. (Pace Depo., p. 84).

According to Ahler, he was approximately fifteen to twenty feet behind Pace. (Ahler Depo. II, pp. 98, 102). He spotted Pace in water up to his nose. (Ahler Depo. II, p. 98). Ahler testified that he told Pace that he could see him and ordered him to surrender, but Pace dove into the water and continued to flee. (Ahler Depo. II, p. 99). At that point, Brix was still on the leash. (Ahler Depo. II, p. 101). Then, Ahler and Brix got tangled up in mangrove roots and Pace managed to gain more ground. (Ahler Depo., p. 102-03). According to Ahler, he was approximately fifty feet behind Pace and approximately twenty or thirty feet behind Brix. (Ahler Depo. II, pp. 109-111). Ahler kept screaming for Pace to stop. (Ahler Depo. II, p. 104). After tracking him further, Ahler saw Pace and told Brix to go after him. (Ahler Depo. II, p. 105). At that point Brix was off the leash.[3] *Id.* Ahler testified that Pace was "just in sight" when he let the dog go and that the dog stayed within his

---

[3] Ahler could not "say for sure" when he first let Brix off the leash. (Ahler Depo. II, p. 105). He testified that he had to take him off the leash to get him through the canal and that he knew "definitely, when [he] saw [Pace] again, he was off th[e] lead and . . . just had his tracking harness on." (Ahler Depo. II, p. 105).

4

sight until he caught up with Pace. (Ahler Depo. II, p. 106). Ahler could barely see Pace's hands, but saw a figure swimming in the dark. (Ahler Depo. II, pp. 108-109).

According to Pace, he fell into a ditch that had water in it. When he tried to get up to keep running, Brix bit his arm. (Pace Depo., pp. 19-20). Brix could not get a good grip on Pace so when Brix let go, Pace "started running again" and "was able to get away from [Brix]." (Pace Depo., p. 22). At that point, Brix jumped on Pace's back and starting biting his back. (Pace Depo., pp. 22-23). Pace continued to try to break free from Brix, but the dog starting "bitting up and . . . going towards [his] neck." (Pace Depo., p. 24). Pace fell down into the ditch again and into the water. While in the water, Brix bit his face in the area of his right eye. (Pace Depo., pp. 24-25). The dog held on to his face and started to shake his head and body. (Pace Depo., p. 27). Pace, still in deep water, clutched onto the dog and said "help, get the dog off me." (Pace Depo., p. 28).

"[A]fter a little while, [Pace] saw flashlights coming through the woods and . . . started screaming for help." (Pace Depo., p. 28). Pace testified that approximately one minute passed from the time he heard the dog running behind him until the time the dog bit the right side of his face. (Pace Depo., p. 26). Pace testified that he saw the officer's flashlights approaching him approximately thirty seconds to a minute after Brix bit the right side of his face. (Pace Depo., pp. 29, 99-100).

Upon approaching Pace and Brix, Ahler said "let go of the dog, show me your hands." (Pace Depo., p. 30). Pace said "look, I have no weapons, I just want the dog off me" and Ahler looked at him for approximately twenty or thirty seconds. *Id.* at 31-32. Ahler then spoke to the dog in what sounded to Pace like German and when the dog would not release his bite, Ahler pried the dog off

Pace's face.[4] (Pace Depo., p. 32). Pace remembers two officers leading him through the swamp. Soon after exiting the swamp, he was transported to Bayfront Medical Center for medical treatment. He suffered severe injury to his right cheek and eye.

**Section 1983 Claim Against Ahler in his Individual Capacity**

Ahler contends summary judgment is proper because he is entitled to qualified immunity on Pace's § 1983 claim.[5] The defense of qualified immunity protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed. 266 (2002)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

To determine the applicability of qualified immunity, the government official's conduct is evaluated under an "objective legal reasonableness" standard. *Koch v. Rugg*, 221 F.3d 1283, 1295

---

[4] Ahler testified that he told Brix to grasp or hold firmly in German because he wanted the dog to hold the bite until he got to Pace. (Ahler Depo., pp. 114, 118). Ahler considered Pace to be an immediate threat to him and the public and he did not want Pace to escape. (Ahler Depo. II, pp. 115, 122). Once Ahler reached Pace, he told Pace to stop taking Brix under water and then gave the command for Brix to let go. (Ahler Depo. II, pp., 119, 122-23). According to Ahler, Brix released Pace upon being given the command to do so. (Ahler Depo. II, pp. 122-23).

[5] Violations of § 1983 occur when a person suffers the deprivation of rights secured by the U.S. Constitution and federal laws inflicted by one acting "under color of any state statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia." 42 U.S.C. § 1983. "Since § 1983 confers no substantive rights, a plaintiff seeking relief under the statute must bring a § 1983 claim in conjunction with some other statute or constitutional provision that provides substantive rights." *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). The underlying basis for Pace's § 1983 claim is his claim that Ahler violated his Fourth Amendment rights by exerting excessive force in the course of his arrest. (Dkt. 2).

(11th Cir. 2000) (citations omitted). The official's subjective intent is irrelevant to the inquiry. *Id.* The Supreme Court has established a two-part test to determine the applicability of qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). First, the Court must determine whether the Plaintiff has alleged the deprivation of a constitutional right. *Id.* The second step in the analysis is to determine whether Plaintiff's right was "clearly established" at the time the alleged violation occurred. *Id.*

It is undisputed that Ahler was acting within the scope of his discretionary authority when he apprehended and arrested Pace. Accordingly, it must be determined whether the facts, when viewed in the light most favorable to Pace, establish that Ahler committed a constitutional violation and if so, whether Pace's constitutional right was "clearly established" at the time of the incident. *See Glover v. Eight Unknown D.E.A. Agent/Drug Task Force Agents from Birmingham, Alabama Task Force*, 2007 WL 559805 * 2 (11th Cir. 2007) (the court must not "assume that a constitutional violation occurred and move on to the 'clearly established' prong").

***Violation of a Constitutional Right***

Pace contends Ahler violated his constitutional rights by exercising excessive force while apprehending and arresting him on January 23, 2003. The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest. *Graham v. Conner*, 490 U.S. 386, 394-95 (1989). To assert a violation of the Fourth Amendment for the use of excessive force, Pace must demonstrate that (1) a seizure occurred and (2) the force used to effect the seizure was unreasonable. *Troupe v. Sarasota County, FL*, 419 F.3d 1160, 1166 (11th Cir. 2005), *cert. denied*, 126 S.Ct. 1914 (2006).

Determining whether the force used was reasonable under the Fourth Amendment requires

7

a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *Crosby v. Paulk*, 187 F.3d 1339, 1351 (11th Cir. 1999). Therefore, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993) (quoting *Graham*, 490 U.S. at 396). "A constitutional violation occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used." *Graham*, 490 U.S. at 396.

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 41 U.S. 520, 559 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case," including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. In addressing these three factors, the Court should consider the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted. *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

Based on the facts viewed in the light most favorable to Pace, Ahler's actions did not constitute a violation of Pace's Fourth Amendment right to be free from excessive force. All three factors articulated in *Graham* weigh in favor of finding the force asserted by Ahler reasonable in light of the totality of the circumstances.

First, it was reasonable for Ahler to believe that Pace had committed or participated in serious crimes. Moreover, Ahler witnessed Pace committing the felony of fleeing and eluding, as

8

well as reckless driving. It was therefore reasonable for Ahler to believe Pace had committed or participated in the burglary of an occupied residence and the theft of the Dodge Caravan. *See Kaymore v. State*, 260 So. 2d 851 (Fla. 1st DCA 1972) (police had probable cause to suspect occupants of vehicle associated with crime were responsible for the crime), *Lowe v. State*, 191 So. 2d 303, 304 (Fla. 3d DCA 1966) (officer had reasonable ground to believe felony had been committed by persons driving a vehicle associated with the crime).

Second, it was reasonable for Ahler to believe Pace posed an immediate threat to his safety and the safety of others. Pace's reckless driving while attempting to evade capture posed danger to the officers trying to apprehend him. While the car chase was short in duration, Pace admitted to driving in excess of the speed limit and running stop signs on city streets.[6] Pace also turned his vehicle's lights off and drove into a dark field. This type of reckless driving reasonably led Ahler to believe that Pace had little regard for his own safety, the safety of the officers trying to apprehend him, and the safety of anyone else he may have encountered on the road that night.[7] *See Mongeau v. Jacksonville Sheriff's Office*, 197 Fed. App'x 847, 850 (11th Cir. 2006) (officer was reasonable in believing plaintiff posed an immediate threat where plaintiff ran traffic lights, sped, and drove the wrong way on the highway in an attempt to evade arrest).

Pace again demonstrated desperation and a disregard for his own safety and that of the officers when he ran into the dark, wet, root entangled mangrove swamp in an effort to hide. Both Pace and Ahler testified that it was difficult to walk in the swamp and at times they were forced to

---

[6] Pace conceded that he was traveling in excess of the speed limit. (Pace Depo., pp. 8-9). Exactly what speed he was traveling is not material to this Court's determination.

[7] While the car chase occurred at approximately 3:30 A.M, there was no certainty that the streets would be empty. By exceeding the speed limit and running through stop signs on city streets, Pace took a risk that he would encounter another car or pedestrian.

swim through chest high water and maneuver through dense vegetation with very limited visibility. It was difficult for Ahler to see Pace, including his hands, which at one point were under water and wrapped around Brix. It was not unreasonable, therefore, for Ahler to believe Pace could be concealing a weapon. These circumstances, combined with the fleeing and eluding, reckless driving, and Ahler's suspicion that Pace had committed car theft and burglary of an occupied dwelling, reasonably led Ahler to believe that Pace was an immediate threat to himself and others.[8]

Third, it is undisputed that Pace attempted to avoid arrest by fleeing. Pace testified that when he saw the flashing police lights and heard the sirens behind him, he knew the police were trying to pull him over. He purposefully led the police on a chase, turned off his car lights, and ran into a dark and dangerous swamp to avoid capture. By fleeing into the dark swamp, Pace put the safety of the officers at risk. Under these circumstances, the use of a K-9 to track Pace was objectively reasonable. *See Mongeau*, 197 Fed. App'x at 851 (finding it objectively reasonable to use K-9 force where suspect was charged with serious crimes, fled and resisted arrest); *Lafavors v. Jenne*, 2006 WL 249544, *2 (11th Cir. 2006) (even though suspect did not attempt to escape during arrest, officer's knowledge of previous escape attempts combined with resistance to the arrest rendered decision to use K-9 force objectionably reasonable).

---

[8] In concluding that Pace posed an immediate threat to the safety of the officers, this Court did not consider that Ahler saw a gun on the seat of the Caravan. Pace contends this fact is in dispute. However, Pace did not deny the existence of the gun in the vehicle. Rather, he testified that he was not aware that there was a gun in the vehicle.

Q:  If the police inventory shows that there was a pellet gun in the vehicle in the front passenger seat, do you have an explanation as to how that got there?
A:  No, sir.
Q:  Can you deny that there was a pellet gun or weapon of some sort in the vehicle?
A:  No, sir, I can't deny it. I don't know.

(Pace Depo., p. 11). Regardless, the existence of a gun in the vehicle and whether Ahler saw a gun on the car seat before he went into the swamp is not determinative. The other undisputed facts support the conclusion that a reasonable officer in Ahler's position could have believed that Pace posed an immediate threat to the officers trying to apprehend him.

While Pace's injuries were severe, the undisputed material facts demonstrate that the use of K-9 force and the severity of Pace's injuries were the direct result of Pace's decision to flee and hide in the dark, densely vegetated mangrove swamp to avoid apprehension. Brix attempted to apprehend Pace in the manner in which he had be trained, namely, the bite and hold method. (Ahler Depo I, p. 207). Under this method, a dog is trained to subdue a suspect by biting his arm or leg, but if a leg or arm is unavailable, the dog is trained to apprehend the suspect by biting any area of his body exposed. If the suspect breaks free, the dog is trained to reestablish the bite. As a result, suspects often suffer serious injury from multiple bites received during the course of an apprehension. *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989). The bite and hold training method is not unconstitutional. Nor is it objectionable unreasonable. *See Kerr*, 875 F.2d at 1550 (recognizing the constitutionality of using police dogs trained in the bite and hold method when an officer is placed in a threatening situation); *see also Kuha v. City of Minnetonka*, 365 F.3d 590, 599-600 (8th Cir. 2004) ("mere use of a police dog trained to bite and hold does not rise to the level of a constitutional violation"and does not constitute deadly force).[9]

Pace's testimony establishes that he suffered multiple bites because Brix was not able to get a firm hold on him because of the conditions in the swamp and because Pace repeatedly attempted to free himself from Brix in attempting to avoid arrest.[10] In light of the short time frame involved

---

[9] *Kuha* was abrogated on the issue of municipality liability by *Szabla v. City of Brooklyn Park, Minnesota*, 2007 WL 1452595 (8th Cir. 2007). *See Szabla*, 2007 WL 1452595 at *8 (holding city municipality did not act with deliberate indifference to constitututional rights of its citizens by failing to train its officers working with K-9s to give advance warning before commanding K-9 to bite and hold suspect).

[10] The facts of this case are distinguishable from the facts in those cases in which courts have held multiple dog bites to be in violation of a plaintiff's Fourth Amendment rights. For example in *Lafavors v. Jenne*, 2006 WL 249544, *2 (11th Cir. 2006), the Eleventh Circuit held that a suspect's constitutional rights would be violated if the dog bit the suspect after he had been "subdued, surrendered or ha[d] ceased resisting or fleeing." However, in *Lafavors*, the K-9 force was found to be reasonable because while the suspect did not attempt to escape during the arrest, the officer had knowledge of his previous escape attempts and the suspect was resisting arrest. *Lafavors*, 2006 WL 249544 at *1.
  Here, under Pace's version of the facts, he did not surrender even after hearing Brix running behind him. Nor did he stop running until Brix caught up with him. Even after having been bitten, Pace continued to struggle with

11

and the conditions under which Pace fled and was found, Ahler's control over Brix and his actions after Pace was bitten were not objectively unreasonable. Pace had demonstrated strong determination to evade capture and arrest by putting his own safety at risk by running into the swamp and fighting off Brix's attempt to apprehend him. It was not unreasonable for Ahler to have believed that Pace could be armed or dangerous. Therefore, it was not unreasonable for Ahler to request that Pace show his hands before calling off Brix. *See Kuha*, 365 F.3d at 600 (officer's request to see suspect's hands before releasing dog bite was not unreasonable where suspect swam through a swamp rather than encounter police officer, officer was searching area that was difficult to traverse, and officer knew inhabited apartment buildings were nearby). After Pace showed Ahler his hands, Ahler took only twenty or thirty seconds to assess the safety of the situation and determine whether releasing the dog would enable Pace to break free again. In light of the overall conditions, including Ahler's limited visibility, this period of time was not unreasonable.[11]

Pace's strongest argument supporting a finding that Ahler's actions were in violation of the Fourth Amendment is that Ahler failed to warn Pace that he was using a K-9 to apprehend him before releasing Brix from the leash.[12] Contrary to Pace's argument, however, not hearing a warning does not establish that one was not given nor, under the circumstances, raise a genuine issue of

---

Brix, attempting to free himself. Pace did not surrender until Brix's final bite to the right side of his face, after Pace had submerged himself and Brix. These facts are distinguishable from those in *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000). There, qualified immunity was denied where an officer let the K-9 attack the suspect for two minutes even though it was clear that the suspect did not pose a threat of bodily injury to the officer and the suspect was not attempting to flee or resist arrest.

[11] While the facts concerning when and how Brix released his bite are in dispute, this Court finds that even assuming Pace's version of the facts are true and Ahler had to pry Brix's mouth off Pace, this fact alone does not render Ahler's use of force unreasonable. Under the totality of the circumstances, the use of Brix and the force asserted was objectionably reasonable. *See Graham*, 490 U.S. at 396 ("[a] constitutional violation occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used").

[12] *See e.g. Kuha*, 365 F.3d at 598 ("a jury could find it objectively unreasonable to use a K-9 trained in the bite and hold method without first giving the suspect a warning and opportunity to peacefully surrender," but recognizing that "there may be exceptional cases where a warning is not feasible").

12

material fact.

While Pace maintains that he did not hear a verbal warning, there is ample evidence that Ahler did verbally warn Pace. However, even under Pace's version of the facts, despite not hearing a verbal warning, Pace believed the police would pursue him and knew that a dog was running close behind him. Pace testified that several months before the incident, police had used a K-9 to track and apprehend him. (Pace Depo., p 82). Thus, despite his experience with K-9s and being aware that a dog was behind him, Pace chose not to surrender and continued to flee. Under these circumstances, Ahler's failure to warn Pace, or more accurately, Pace's failure to hear a warning, did not render Ahler's actions objectively unreasonable. Nonetheless, for the reasons discussed below, even if Ahler's failure to warn rendered his actions objectively unreasonable, Ahler is entitled to qualified immunity because Pace's Fourth Amendment right in this regard was not "clearly established" at the time of the incident.

In conclusion, this Court must be mindful of *Graham*'s explicit recognition of, and allowance for, a measure of deference to police judgment given the "tense, uncertain and rapidly evolving" circumstances that police often confront. *Graham*, 490 U.S. at 396-97 ("[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving-about the amount of force that is necessary in a particular situation").[13] Accordingly, in light of the totality of the circumstances, Ahler's actions did not constitute excessive force and did not violate Pace's Fourth Amendment rights.

---

[13] The Eleventh Circuit has held that a court should not "view the matter as judges from the comfort and safety of [ ] chambers, fearful of nothing more threatening than the occasional paper cut . . . [Rather, the Court must] see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Mongeau v. Jacksonville Sheriff's Office*, 197 Fed. App'x 847, 850 (11th Cir. 2006) (citing *Crosby v. Monroe County*, 394 F.3d 1328, 1333-34 (11th Cir. 2004)).

13

### *Pace's Constitutional Rights were not Clearly Established*

Even assuming Ahler's actions constituted excessive force in violation of Pace's Fourth Amendment rights, Pace cannot demonstrate that his constitutional right was "clearly established" at the time of the incident. In other words, even assuming Ahler's use of Brix and failure to give a verbal warning rendered his use of force objectively unreasonable, it was not "clearly established" at the time of the incident that using non-deadly K-9 force under the circumstances to apprehend a fleeing felon without a verbal warning was in violation of the Fourth Amendment. Accordingly, Ahler is entitled to qualified immunity.

A right is "clearly established" if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (citing *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). In an excessive force case, a plaintiff can show that the law "clearly established" that the officer's use of force was excessive in two ways: (1) "a controlling and materially similar case declares the official's conduct unconstitutional" or (2) "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Priester*, 208 F.3d at 926. In this Circuit, the law may be "clearly established" for qualified immunity purposes only by opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeal, or the highest court of the state in whose law is at issue.[14] *Hamilton v. Cannon*, 80 F.3d 1525, 1531 n.7 (11th Cir. 1996).

---

[14] Whether Ahler violated the Palmetto Police Department's warning policy is not relevant to this Court's inquiry. The policies of the Palmetto Police Department do not represent legal authority in this Circuit which would have put Ahler on notice that his actions were in violation of Pace's constitutional rights.

Pace has not cited any *controlling* authority which would establish that Ahler's actions, including his use of Brix and his failure to give a verbal warning, were a clear violation of Pace's constitutional rights under the circumstances. Nor does the Court find that the law in this area was "clearly established" in January 2003 "in such a concrete and factually defined context to make it obvious to all reasonable government actors in [Ahler's] place that [utilizing Brix to apprehend Pace and failing to give a verbal warning] violated federal law." *See Lassiter v. Alabama A &M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994).

Further, Ahler's conduct was not so far beyond the hazy border between excessive and acceptable force that he should have known he was violating the Constitution even without case law on point. Accordingly, this case does not fall into the narrow exception to the rule requiring particularized case law. *Priester*, 208 F.3d at 926 (citing *Smith*, 127 F.3d at 1419). It simply is "not a case where officers are accused of siccing a police dog on a manifestly unarmed and compliant suspect" or one in which the suspect "submitted immediately to the police." *See Kuha*, 365 F.3d at 601; *compare Priester*, 208 F.3d at 927 (recognizing lack of particularized case law in area of K-9 force, but denying qualified immunity because plaintiff was a suspect of stealing approximately $20 in snacks, plaintiff did not pose a threat of bodily harm, was not attempting to flee or to resist arrest, but rather submitted immediately to police and followed police instruction). Therefore, based on the particular factual circumstances in which Ahler acted and the lack of "clearly established" case law, this Court concludes that Ahler is entitled to qualified immunity on Pace's § 1983 claim.

## Assault and Battery Claim Against Ahler

Ahler contends that he is statutorily immune from Pace's assault and battery claim pursuant to § 768.28(9)(a), Florida Statutes. In relevant part, § 768.28(9)(a) provides:

15

> [n]o officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a), *Fla. Stat.*

Accordingly, in order for an officer to be held personally liable for an injury resulting from an act the officer committed in the scope of his employment, the officer must have acted in bad faith, with malicious purpose, or in a willful and wanton manner. *See Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004). Based on the facts viewed in the light most favorable to Pace, Ahler did not act in bad faith or maliciously when he apprehended and arrested Pace. To the contrary, for the reasons set forth above, Ahler's actions were objectionable reasonable under the totality of circumstances. Therefore, Ahler is statutorily immune from Pace's assault and battery claim. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant Kristopher Ahler's Supplemental Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 65) is **GRANTED**. Count II and IV of the Complaint are **DISMISSED**.[15]

**DONE AND ORDERED** in chambers this 11th day of June, 2007.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to:
Counsel of Record

---

[15] Pace's claim in Count I of the Complaint against the City of Palmetto for its alleged failure to train and supervise its canine division is set for the trial term commencing July 2, 2007.

16